**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KIMBERLY MANSON and RACHEL BOSCH, individually and on behalf of all others similarly situated,<br><br>                        Plaintiffs,<br><br>    v.<br><br>ALYK, INC.,<br><br>                      Defendant. | Civil Action No.: 7:21-cv-05688-PMH<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Kimberly Manson and Rachel Bosch ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant ALYK, Inc. ("ALYK" or "Defendant") for the manufacture and sale of the LOLA Tampon products identified below. Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action against Defendant ALYK, Inc. ("Defendant") for the manufacture and sale of LOLA Tampons (the "Products" or "LOLA Tampons").  The Products are defective because they unravel and/or come apart upon removal from the body (the "Defect"), and in some cases, cause users to seek medical attention to remove tampon pieces left in the body.  Additionally, the Defect can cause infections, vaginal irritation, localized vaginal injury, and other symptoms.  The Defect renders the Products unsuitable for their principal and intended purpose and therefore renders the Products worthless.

2.     The Products are sold in three varieties:  LOLA Compact Applicator Tampons, Cardboard Applicator Tampons, and Non-Applicator Tampons.  The sole difference between each of these varieties concerns the applicator provided and not the tampon itself.  Each of the three varieties is offered for sale with a range of absorbencies.[1]  The differences between the various absorbency ratings concerns the density of the cotton in the tampon.  All Products sold by Defendant are made from 100% organic cotton.

3.     The defect manifests itself equally across each Product because all of the Products contain the same 100% organic cotton that unravels and/or comes apart in the body upon removal.  That is why consumers have lodged similar complaints across all of Defendant's tampon Products.  Moreover, the Products' cotton uniformly lacks a protective coating used in other brands of tampons that prevents them from shedding and/or coming apart inside of consumers.

4.     As cited at length below, complaints from class members about the Products leaving behind tampon pieces inside of them are widespread.  Class members report having to reach inside their bodies to retrieve wads of cotton left by the Products, and several discuss anxiety from the fear that there is more cotton left over, undetected.  Class members have been forced to make visits to physicians for help in removing the remainder of the Product, and several report getting sick as a result of undetected Product remaining inside them.

5.     The Defect is a nuisance that no reasonable consumer would expect to incur when using any tampon, much less one that claims to be "Gynecologist-approved."  Moreover, it is an

---

[1] The Compact Applicator Tampons come in light, regular, super, and super+ absorbencies.  The Cardboard Applicator Tampons come in regular and super absorbencies.  The Non-Applicator Tampons come in regular, super, and super+ absorbencies.  The Cardboard Applicator Tampons and light Compact Plastic Applicator Tampons expand into a W or butterfly shape upon insertion.  The Non-Applicator Tampons, as well as regular, super, and super+ Compact Plastic Applicator tampons, expand into a barrel or marshmallow shape upon insertion.  Previously, all of Defendant's Compact Plastic Applicator Tampons expanded into a marshmallow shape upon insertion.

unacceptable safety hazard requiring a prompt recall, just as one of Defendant's competitors did when users reported the same issues with their tampons.

6.      Defendant is well-aware of the issue.  Consumers have complained about it repeatedly to Defendant itself, and Defendant has reviewed and responded to many similar complaints on third-party internet review websites.  But Defendant refuses to do anything to remediate or address the issue.

7.      Plaintiffs bring claims against Defendant individually and on behalf of a class of all other similarly situated purchasers of the Products for violation of New York General Business Law ("GBL") §§ 349 & 350, breach of express warranty, breach of implied warranty of fitness, breach of the Magnuson-Moss Warranty Act, fraud, unjust enrichment, negligent misrepresentation, and for violation of California's consumer protection laws.

## THE PARTIES

8.      Plaintiff Kimberly Manson is, and at all times relevant to this action has been, a resident of Chester, New York.  In February of 2021, Ms. Manson purchased LOLA Compact Applicator Tampons for approximately $12 from a Walmart store located in Monroe, New York. In approximately the Spring of 2021, when attempting to remove one of the Products from her person after use, the Product unraveled and disintegrated, leaving behind portions of the Product inside of Ms. Manson.  Prior to purchasing the Product, Ms. Manson read and relied on the Product's packaging, including the representation that it was "Gynecologist-approved."  She understood this language to mean that the Product was safe to use.  Ms. Manson purchased the Product based on Defendant's representation that the Product was "Gynecologist-approved" in that she would not have purchased the Product, or would have only been willing to pay a lesser price, if she knew that this representation was misleading.  Due to the Defect, Ms. Manson

experienced burning sensations and localized discomfort.  After experiencing the Defect, Ms. Manson stopped using the Products.

9.      Plaintiff Rachel Bosch is, and at all times relevant to this action has been, a resident of San Diego, California.  In or about the Spring of 2021, Ms. Bosch purchased LOLA Compact Applicator Tampons for approximately $12 from a Walmart store located in San Diego, California.  Later in the Spring of 2021, when attempting to remove one of the Products from her person after use, the Product unraveled and disintegrated, leaving behind portions of the Product inside of Ms. Bosch.  Prior to purchasing the Product, Ms. Bosch read and relied on the Product's packaging, including the representation that it was "Gynecologist-approved."  She understood this language to mean that the Product was safe to use.  Ms. Bosch purchased the Product based on Defendant's representation that the Product was "Gynecologist-approved" in that she would not have purchased the Product, or would have only been willing to pay a lesser price, if she knew that this representation was misleading.  Due to the Defect, Ms. Bosch experienced burning sensations and localized discomfort.  After experiencing the Defect, Ms. Bosch stopped using the Products.

10.      Defendant ALYK, Inc. is a Delaware corporation with its principal place of business in New York, New York.  Defendant markets, distributes, and sells the Products throughout the United States.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendant.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant is headquartered in this District.

## COMMON FACTUAL ALLEGATIONS

### I.     The Products

13.     On each of the Products' packaging, Defendant represents that the Products are "Gynecologist-approved and hypoallergenic":



14.     Defendant also boasts that the Products are "Gynecologist-approved" on each of the Products' webpages.  This representation misleads consumers into believing the Products are safe when, in fact, they are not safe due to the Products' Defect.

### II.     The Products Are Defective

15.     Defendant's brand-name products include LOLA feminine hygiene products, which it manufactures, markets, and sells to consumers throughout New York and the entire United States.  Throughout its website, Defendant boasts that "We strive for full transparency in all we do.  From our ingredient lists to our candid conversations about periods and sex, we

always tell it like it is," and "We believe reproductive care should be safe and accessible for everyone.  We're dedicated to making that a reality."[2]

16.     Unfortunately for many consumers, LOLA Tampons are not "safe… for everyone."  Indeed, the Products are defective because they are prone to unraveling and/or coming apart upon removal, and in some cases, cause users to seek medical attention to remove tampon pieces left in the body.  Additionally, the Defect can cause infections, vaginal irritation, localized vaginal injury, and other symptoms.  The Defect renders the Products unsuitable for their principal and intended purpose.

### A.     Defendant's Own Website Is Flooded With Class Member Complaints About The Defect

17.     Defendant knows about the Defect through dozens of reviews posted on its own website.  Indeed, numerous consumers posted product reviews about the Product's defective nature on LOLA's website, www.mylola.com, which Defendant actively monitors.

18.     For example, in 2019, a consumer explained her issue with LOLA tampons: "Every time I took one out the cotton would fall apart leaving some inside me… it's dangerous and unhealthy for the tampon to be falling apart and leaving cotton inside of me."

Morgan Verified Buyer                                                                                                10/06/19
★☆☆☆☆

**Absorbency just okay but tampon actually falls apart**

I really wanted to like these tampons. I was first disappointed with the absorbency but I figured I would just customize my box to a higher absorbency tampon next time. Then I realized what was happening when I took a tampon out…it was falling apart. Every time I took one out the cotton would fall apart leaving some inside me. Until the product is improved I won't be ordering again. I would love to love this but it's dangerous and unhealthy for the tampon to be falling apart and leaving cotton inside of me. Read Less

⤢ Share |                                                                    Was This Review Helpful?   👍 0   👎 0

19.     Another consumer posted a review that she "had a tampon break apart inside me when trying to remove it… As a result, I had to go to my OBGYN for removal of fibers and

---

[2] https://mylola.com/

pieces left behind… I am throwing away the rest of the product that I have, as they are unsafe to use, which is a huge waste of money for me."



20.     A different consumer reported that "COTTON SHEDS INSIDE YOU… I have been experiencing cotton pulling off of the tampon during removal."



21.     Yet another consumer reported that the tampon "Rips apart inside of you… there was cotton stuck in me.  Worst tampon experience I've ever had."



22.     Again, another consumer complained that the Products "rip inside you… They really need to focus on the quality of the tampon."



23.     Another buyer complained that the "tampons started to kind of fall apart" as the consumer was removing it.  She stated, "it's making me a little nervous to continue using them if they are shedding inside me."



24.     Again, an additional consumer stated the Products "do fall apart… They are messy, meaning they leave too much cotton fibers.  I am TERRIFIED of it getting stuck."



25.     A consumer reflected on her experience with the Defect, "On one occasion… the cotton of a tampon came apart inside me – I was pulling out bits of cotton for a couple of days!":



26.     Yet another consumer complained that the "Tampons do not hold well and fall apart."  This consumer gave the Products to her sister who "complained of same exact issues.":

**Christine L.** Verified Buyer                                                                                      10/22/20

★★☆☆☆

**Tampons leak, fall apart, not dependable**

Tampons do not hold well and fall apart. They leak as well. I ordered for my daughter just to find out she's not been using them due to this. I found boxes unused so I then I gave them to my sister to make use of them.... and she complained of same exact issues.

⤴ Share  |                                                                    Was This Review Helpful?  👍 0    👎 0

      **B.**      **Defendant Reviews And Monitors The Countless Complaints On The Internet About The Defect, But Does Nothing To Fix The Problem**

27.      On June 3, 2019, a consumer shared her fear of Toxic Shock Syndrome when she "noticed that pieces of the tampons were repeatedly falling apart and becoming stuck inside of me.  I would have to do a thorough check every time I changed my tampon… Marketing an item as 'safer' (strictly based on a natural or organic label), when the item carries a higher risk for left behind material that could lead to an infection, is extremely misleading."  Defendant responded to this complaint.



28.     On August 19, 2019, another consumer shared concerns regarding Toxic Shock

syndrome because "Cotton tampon easily falls apart leaving fibers in vagina."  Defendant again

responded to this complaint.



29.     An additional consumer complained that "two of the three tampons I have tried so far broke inside me and left fibers behind."  Defendant responded, stating "we take product complaints incredibly seriously," and again directed the consumer to customer service.



30.     On November 20, 2019, yet another consumer reported her dissatisfaction, explaining "I used my first tampon yesterday upon removing it, it started to tear…leaving particles behind."  Defendant replied to the post and directed the consumer to customer service.



31.     On December 4, 2019, a consumer who had complained of "a terrible experience as one of the tampons literally broke in half inside of me," shared her account of Defendant's awareness of the defect.  Defendant "responded to me, refunded the purchase, and asked many questions about my experience… I appreciate the follow up and refund, though do still want people to use caution when purchasing and wearing."



32.     On December 29, 2019, a consumer reported that "I had to visit my OBGYN yesterday to have pieces of the tampon removed when it broke apart inside of me, it was like pulling cotton balls out of my vagina."  Defendant responded to this complaint.



33.     Another consumer complained that "a tampon was ripped inside of me and causing me to go to emergency OBGYN," and Defendant responded, directing her to customer service.



34.     On January 17, 2020, an additional consumer complained that "The tampon literally ripped inside of me leaving tons of cotton inside me.  Now I have to make an emergency doctors visit."  Here too, Defendant responded to this complaint.



35.     Another consumer similarly complained that "The tampons shed threads of cotton… This needs to be looked into and addressed!"  Defendant responded to this complaint as well.



36.     On June 11, 2020, another consumer complained that "The tampon shreds very easily, leaving bits of cotton behind as I removed one.  Definitely fearful that there's some left that I wasn't able to remove."  Defendant responded to this complaint as well.



37.     In July of last year, a consumer posted a review that "when I pulled it out to change, I almost had a heart attack half of the cotton had ripped into a couple pieces and was stuck up there I had to reach in there to try to pull it out."  Defendant responded to this complaint as well.



38.     On August 7, 2020, another consumer complained that "the tampons have been coming apart when I pull them out, leaving cotton strands behind inside me.  This is the sort of thing that other tampon companies would do recalls over.  But not Lola for some reason... Last time it happened I didn't realize the tampons left behind anything at all until I got sick and found the wad of cotton inside me."  Defendant responded to this complaint as well.



39.     On August 8, 2020, a consumer reported that "I noticed after inserting my second tampon that there were pieces of the cotton pulled off and left over on the applicator!... TOXIC SHOCK SYNDROME ANYONE????!"  Defendant responded to this complaint as well.



40.     On August 19, 2020, another consumer complained that "last night I am changing my tampon before bed and I go to pull the old one out and it completely came apart inside me. So I spent the next hour digging around trying to make sure I got it all out and now I am freaked out that some is still inside of me and I am going to get sick."  Defendant responded to this complaint as well.



41.     On September 23, 2020, a consumer reported that "I stopped my subscription after having pieces of tampon left inside of me after removing tampon.  I made the company aware of the issue and received zero response."  Defendant responded to this complaint as well.



42.     Also in September of last year, a consumer complained that "they unravel while in use and this is beyond concerning for feminine health.  On several occasions part of the tampon is left behind during extraction."  Defendant responded to this complaint as well.



43.     On November 5, 2020, a consumer posted that the Product "Leaves residue INSIDE OF YOU… Literally every cycle i use them, i find pieces that didn't come out when I removed it!"  Defendant responded and explained that "we normally aim to get back to every customer within one business day across all of our platforms… I have passed your feedback along and know it will be taken to heart."  Defendant responded to this complaint as well.



44.     In November of last year, another consumer reported that "They shed," and Defendant responded to this complaint as well.



45.     In February 2021, a consumer posted a review that "their tampons come a part a little which leaves a little bit of cotton in there… That is not safe!"  Defendant responded to this complaint as well.



46.     Another consumer reported that "they shed or pull like a cotton ball when trying

to change the tampon… a huge piece of cotton ripped off and stayed in me resulting in a visit to

the dr."  Defendant replied, "we really appreciate you alerting us of this issue so that we can

escalate this immediately to our product team and manufacturing partners to make sure this

doesn't happen again."  Defendant responded to this complaint as well.



47.     On April 6, 2021, an additional consumer complained that she "went to change one and it came apart.  Left a bunch of cotton behind."  Defendant responded to this complaint as well.



48.     Defendant's management also knew (or should have known) about the Defect because of the similarity of complaints posted to Defendant's website and elsewhere, which Defendant's employees monitor and respond to.  The fact that so many customers made similar complaints about the same Products indicates that the complaints were not the result of user error or an anomalous incident, but instead a systemic problem with the Products.

**III.     The Defect Poses An Unreasonable Health Risk To Class Members**

49.     Having a tampon stuck in the vagina increases a woman's risk of developing toxic shock syndrome ("TSS") a serious infection.  The longer a tampon, or a piece of a tampon gets stuck, the greater the risk.[3]

---

[3] https://www.healthline.com/health/tampon-stuck (last accessed June 29, 2021).

50.     That is why women that are concerned about stuck portions of tampons are advised to seek emergency medical care, as many class members were forced to do after using the Product.[4]

**IV.     A Recall Is Necessary To Protect Class Members From The Impact Of The Defect**

51.     A recall is needed to protect class members from the impact and dangers stemming from the Defect in Defendant's Products.

52.     In 2018, one of Defendant's competitors, Kimberly Clark, issued a full recall of its Kotex Tampons which exhibited the same issue of "unraveling and/or coming apart upon removal."  Unsurprisingly, the issue caused "users to seek medical attention to remove tampon pieces left in the body," just like the above-cited reports regarding Defendant's Product.  And there, like here, there were "reports of infections, vaginal irritation, localized vaginal injury, and other symptoms."

53.     Instead of sweeping the issue under the rug—like Defendant is doing with its Products—Kimberly Clark issued a recall and advised consumers to not use the affected tampons.  But Kimberly Clark's advice to refrain from using those tampons would apply equally to Defendant's Products, which exhibit the same Defect.

54.     Under these circumstances, a recall is necessary for two reasons.  First, as noted above, significant health concerns are implicated by Defendant's defective Products.  And second, even if consumers do not necessarily experience documented health problems, it is still an unacceptable expectation for consumers to need to remove broken portions of tampons from their bodies.  Simply stated, tampons which break or shed in users' bodies are not functioning the way tampons are intended or expected to perform.

---

[4] *Id.*

23

55.     Just as a recall was necessary to protect consumers from the affected Kotex tampons, so too, it is necessary here to protect consumers from Defendant's Products.

## CLASS REPRESENTATION ALLEGATIONS

56.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased the Products (the "Class").  Excluded from the Class are persons who made such purchases for purpose of resale.

57.     Plaintiff Manson also seeks to represent a subclass of all Class Members who purchased the Products in the State of New York (the "New York Subclass").

58.     Plaintiff Bosch also seeks to represent a subclass of all Class Members who purchased the Products in the State of California (the "California Subclass").

59.     At this time, Plaintiffs do not know the exact number of members of the aforementioned Class and Subclass ("Class Members" and "Subclass Members," respectively); however, given the nature of the claims and the number of retail stores in the United States selling Defendant's Products, Plaintiffs believe that Class and Subclass members are so numerous that joinder of all members is impracticable.

60.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include, but are not limited to:

      (a)     Whether the Products are defective;

      (b)     Whether Defendant knew of the Products' defective nature;

      (c)     Whether the Products are fit for their intended purpose;

      (d)     Whether Defendant's conduct was unfair;

      (e)     Whether Defendant has breached warranties on the Products' packaging;

(f)     Whether Defendant has been unjustly enriched as a result of the unlawful and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant by Plaintiffs and the Class; and

(g)     Whether Plaintiffs and the Class have sustained damages with respect to the common law claims asserted, and if so, the proper measure of their damages.

61.     With respect to the New York Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Defendant violated New York G.B.L. §§ 349 & 350.

62.     With respect to the California Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Defendant violated California's consumer protection laws.

63.     Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, purchased, in a typical consumer setting, Defendant's Products, and Plaintiffs sustained damages from Defendant's wrongful conduct.

64.     Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses and have retained counsel that is experienced in litigating complex class actions. Plaintiffs have no interests which conflict with those of the Class or the Subclass.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

66.     The prosecution of separate actions by members of the Class and the Subclass would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the

interests of the Class and the Subclass even where certain Class or Subclass members are not parties to such actions.

**<u>COUNT I</u>**
**(Violation of New York GBL § 349)**

67.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

68.     Plaintiff Manson brings this claim individually and on behalf of the members of the New York Subclass against Defendant.

69.     By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by making misleading representations concerning the Products' fitness for their intended use as tampons.

70.     The foregoing deceptive acts and practices were directed at consumers.

71.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent material characteristics of the Products to induce consumers to purchase them.

72.     Plaintiff Manson and New York Subclass members were injured as a direct and proximate result of Defendant's violation because (a) they would not have purchased the Products on the same terms if the true facts concerning their defective nature and dangerous propensity to unravel and/or come apart upon removal had been known; and (b) the Products did not perform as promised.  As a result, Plaintiff Manson and members of the New York Subclass have been damaged either in the full amount of the purchase price of the Products or in the difference in value between the Products as warranted and the Products as actually sold.

26

73.     On behalf of herself and other members of the New York Subclass, Plaintiff

Manson seeks to recover her actual damages or fifty dollars, whichever is greater, three times

actual damages, and reasonable attorneys' fees.

## COUNT II
### (Violation of New York GBL § 350)

74.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully

set forth herein.

75.     Plaintiff Manson brings this claim individually and on behalf of the members of

the New York Subclass against Defendant.

76.     Based on the foregoing, Defendant has engaged in consumer-oriented conduct

that is deceptive or misleading in a material way which constitutes false advertising in violation

of Section 350 by misrepresenting that the Products are "Gynecologist-approved," when in fact

the Products suffer from a design defect which causes them to unravel and/or come apart upon

removal, rendering the Products unsafe.

77.     The foregoing advertising was directed at consumers and was likely to mislead a

reasonable consumer acting reasonably under the circumstances.

78.     This misrepresentation has resulted in consumer injury or harm to the public

interest.

79.     Plaintiff Manson and New York Subclass members were injured as a direct and

proximate result of Defendant's violation because (a) they would not have purchased the

Products on the same terms if the true facts concerning their defective nature and dangerous

propensity to unravel and/or come apart upon removal had been known; and (b) the Products did

not perform as promised.  As a result, Plaintiff Manson and members of the New York Subclass

have been damaged either in the full amount of the purchase price of the Products or in the difference in value between the Products as warranted and the Products as actually sold.

80.     On behalf of herself and other members of the New York Subclass, Plaintiff Manson seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or five hundred dollars per violation, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT III
### (Breach of Express Warranty)

81.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

82.     Plaintiffs bring this claim individually and on behalf of members of the Class and Subclasses against Defendant.

83.     In connection with the sale of the Products, Defendant, as the designer, manufacturer, marketer, distributor, and/or seller issued written warranties by misleadingly representing that the Products were "Gynecologist-approved."  Reasonable consumers understand this to mean the Products are safe for use.

84.     In fact, the Products do not conform to the above-referenced representation because the Products are defective and dangerous.

85.     Plaintiffs and Class members were injured as a direct and proximate result of Defendant's breach because (a) they would not have purchased the Products if they had known that the Products were defective and dangerous, and (b) they overpaid for the Products on account of their misrepresentation that they are "Gynecologist-approved."

86.     In accordance with UCC § 2-607, Plaintiffs have provided written notice of Defendant's breach of warranty within a reasonable time after they discovered Defendant's breach.

## COUNT IV
### (Breach of the Magnuson-Moss Warranty Act)

87.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

88.     Plaintiffs bring this case individually and on behalf of the members of the Class and Subclasses against Defendant.

89.      LOLA Tampons are consumer products as defined in 15 U.S.C. § 2301(1).

90.     Plaintiffs and Class members are consumers as defined in 15 U.S.C. § 2301(3).

91.     Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

92.     In connection with the sale of the Products, Defendant issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that the Products were "Gynecologist-approved."

93.     However, the Products are defective and unsafe.

94.     By reason of Defendant's breach of warranty, Defendant violated the statutory rights due to Plaintiffs and Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq., thereby damaging Plaintiffs and Class members.

95.     Plaintiffs and Class members were injured as a direct and proximate result of Defendant's violation because (a) they would not have purchased the Products if they had known that the Products were defective and dangerous, and (b) they overpaid for the Products on account of their misrepresentation that they are "Gynecologist-approved."

<u>**COUNT V**</u>
**(Breach of Implied Warranty of Fitness)**

96.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

97.     Plaintiff Bosch brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Defendant.

98.     Defendant is, and at all relevant times was, a merchant engaged in the business of manufacturing and distributing, among other things, LOLA Tampons.

99.     Plaintiff Bosch and the Class Members purchased the Products.

100.     Defendant is a manufacturer and merchant with respect to goods of this kind, which were sold to Plaintiff Bosch and other consumers, and there was in the sale to Plaintiff Bosch and other consumers an implied warranty that those goods were merchantable and that they were fit for their intended use as tampons.

101.     However, Defendant breached that warranty implied in the contract for the sale of goods in that the Products are completely unusable, lack even the most basic degree of fitness for ordinary or intended use, and are not safe for human use as set forth in detail herein above. Thus, the Products are completely unusable and worthless at the point of purchase.

102.     The Products are defective and unusable because they were distributed to the public containing a harmful Defect, and because the Defect was substantially likely to manifest through the customary and intended use of the Products.  As a result, the Products were not usable and dangerous to the health of its consumers.

103.     Plaintiff Bosch and Class members purchased the Products in reliance upon Defendant's skill and judgment in properly packaging and labeling the Products.

104.     The Products were not altered by Plaintiff Bosch or Class members.

105.    The Products were defective at the time of sale when they left the exclusive control of Defendant.  The defect described in this complaint was latent in the product and not discoverable at the time of sale.

106.    As a direct and proximate result of this breach of warranty by Defendant, Plaintiff Bosch and other consumers have been damaged by paying monies for products that are completely unusable and unfit for their intended purpose.

107.    Plaintiff Bosch seeks damages in an amount to be proven at trial for the injuries suffered from Defendant's breach of the implied warranties. The damages suffered by Ms. Bosch and the Class Members include, but are not limited to, the monies paid to Defendant for the Products.

108.    As a result of Defendant's conduct, Plaintiff Bosch did not receive goods as impliedly warranted by Defendant to be merchantable, but instead received defective Products that are worthless and did or are substantially likely to cause harm.

## COUNT VI
### (Fraud)

109.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

110.    Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclass against Defendant.

111.    As discussed above, Defendant misleadingly represented on the Products' packaging that they were "Gynecologist-approved."

112.    The misleading representations were made with knowledge of their falsehood. Nonetheless, Defendant continues to sell its defective and dangerous Products to unsuspecting consumers.

113.    The false and misleading representations were made by Defendant, upon which Plaintiffs and members of the Class reasonably and justifiably relied, and were intended to induce and actually induced Plaintiffs and members of the Class to purchase LOLA Tampons.

114.    The fraudulent actions of Defendant caused damage to Plaintiffs and members of the Class, who are entitled to damages and other legal and equitable relief as a result.

**COUNT VII**
**(Unjust Enrichment**)

115.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

116.    Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclass against Defendant.

117.    Plaintiffs and Class Members conferred benefits on Defendant by purchasing the Products, which were useless and worthless at the point of purchase.  Defendant is aware of these benefits.  The benefits conferred upon Defendant were induced by mistake, fraud, coercion and/or request by virtue of Defendant's misrepresentation that the Products are "Gynecologist-approved."

118.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class Members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant knew that the Products were unfit for use as tampons, that the Defect was substantially likely to manifest through the customary and intended use of the Products, and that the Products were worthless at the point of purchase.  Defendant's actions caused injuries to Plaintiffs and Class Members because they would not have purchased the Products if the true facts were known, and because Plaintiffs and Class Members could not use already-purchased Products upon learning of the Defect.

119.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and Class members for its unjust enrichment, as ordered by the Court.

**COUNT VIII**
**(Negligent Misrepresentation**)

120.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

121.     Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclass against Defendant.

122.     As discussed above, Defendant represented that the Products were "Gynecologist-approved," but failed to disclose that the Products are defective and dangerous. Defendant had a duty to disclose this information.

123.     At the time Defendant made these representations, Defendant knew or should have known that this representation was false or made them without knowledge of their truth or veracity.

124.     At an absolute minimum, Defendant negligently misrepresented material facts about the Products.

125.     The negligent misrepresentations made by Defendant, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase LOLA Tampons.

126.     Plaintiffs and Class members would not have purchased LOLA Tampons if the true facts had been known.

127.     The negligent actions of Defendant caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT IX
### (Violation of California's Consumers Legal Remedies Act)

128.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

129.    Plaintiff Bosch brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

130.    This cause of action is brought pursuant to California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750-1785 (the "CLRA").

131.    Plaintiff Bosch and the other members of the California Subclass are "consumers," as the term is defined by California Civil Code § 1761(d), because they bought the LOLA Tampons for personal, family, or household purposes.

132.    Plaintiff Bosch, the other members of the California Subclass, and Defendant have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

133.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendant in transactions intended to result in, and which did result in, the sale of goods to consumers.

134.    As alleged more fully above, Defendant has violated the CLRA by falsely and/or deceptively representing to Plaintiff Bosch and the other members of the California Subclass that the Products were "Gynecologist-approved" when, in fact, they are defective and dangerous.

135.    As a result of engaging in such conduct, Defendant has violated California Civil Code §§ 1770(a)(2), (a)(5), (a)(7), and/or (a)(9).

136.    On June 21, 2021, a pre-suit demand letter was sent to Defendant that provided notice of Defendant's violation of the CLRA and demanded that Defendant correct, repair,

replace or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein.  The letter also stated that if Defendant refused to do so, a complaint seeking damages would be filed.  Defendant has failed to comply with the letter.

137.    Accordingly, pursuant to California Civil Code § 1780(a)(3), Plaintiff Bosch, on behalf of herself and all other members of the California Subclass, seeks injunctive relief, compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's deceptive acts and practices.

## COUNT X
### (Violation California's Unfair Competition Law)

138.    Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

139.    Plaintiff Bosch brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

140.    By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unfair conduct.

141.    As more fully described above, Defendant's acts and practices described above also violate the UCL's proscription against engaging in unlawful, fraudulent, and unfair conduct.

142.    Defendant has violated the UCL's proscription against engaging in unlawful conduct as a result of: (a) its violations of the CLRA, Cal. Civ. Code §§ 1770(a)(2), (5), (7), and (9), as alleged above; and (b) its violations of the FAL, Cal. Bus. & Prof. Code §§ 17500 et seq., as alleged below.

143.    Defendant's acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct.

144.    As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of LOLA Tampons is likely to deceive reasonable consumers.  Indeed, Plaintiff Bosch and the other members of the California Subclass were unquestionably deceived regarding the true nature of LOLA Tampons, as Defendant's marketing, advertising, packaging, and labeling of the Products misrepresents the true facts concerning the Products' characteristics. Said acts are fraudulent business practices.

145.    Defendant's acts and practices described above also violate the UCL's proscription against engaging in unfair conduct.

146.    Plaintiff Bosch and the other California Subclass members suffered a substantial injury by virtue of buying LOLA Tampons which they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and labeling, or by virtue of paying an excessive premium price for the unlawfully, fraudulently, and unfairly marketed, advertised, packaged, and labeled LOLA Tampons.

147.    There is no benefit to consumers from deceptively marketing and labeling LOLA Tampons, which purport to be "Gynecologist-approved," when this claim is misleading and deceptive.

148.    Plaintiff Bosch and the other California Subclass members had no way of reasonably knowing that the LOLA Tampons they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

149.    The gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive, or reason, and such conduct is immoral, unethical, unscrupulous, offends established public policy, and is substantially injurious to Plaintiff Bosch and the other members of the California Subclass.

150.    Defendant's violations of the UCL continue to this day.

151.    Pursuant to California Business and Professional Code § 17203, Plaintiff Bosch and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to: (a) provide restitution to Plaintiff Bosch and the other California Subclass members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff Bosch's and the California Subclass' attorneys' fees and costs.

## COUNT XI
### (Violation of California's False Advertising Law)

152.    Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

153.    Plaintiff Bosch brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

154.    As alleged more fully above, Defendant has falsely advertised LOLA Tampons by claiming that they are "Gynecologist-approved" when, in fact, they are dangerous and defective.

155.    Plaintiff Bosch and the other members of the California Subclass have suffered injury in fact and have lost money or property as a result of Defendant's violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 et seq.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a.    For an order certifying the nationwide Class and the Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Subclasses and Plaintiffs' attorneys as Class Counsel to represent the Class and Subclass members;

b.    For an order declaring Defendant's conduct violates the statutes referenced herein;

c.      For an order finding in favor of Plaintiffs, the nationwide Class, and the
        Subclasses on all counts asserted herein;

d.      For compensatory, statutory, and punitive damages in amounts to be
        determined by the Court and/or jury;

e.      For prejudgment interest on all amounts awarded;

f.      For an order of restitution and all other forms of equitable monetary relief;

g.      For an order awarding Plaintiffs and the Class and Subclass their
        reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.


Dated:  October 15, 2021                       Respectfully submitted,


                                               By:   */s/ Yitzchak Kopel*
                                                     Yitzchak Kopel

                                               **BURSOR & FISHER, P.A**
                                               Yitzchak Kopel
                                               Alec M. Leslie
                                               888 Seventh Avenue
                                               New York, NY  10019
                                               Telephone: (646) 837-7150
                                               Facsimile: (212) 989-9163
                                               Email:  ykopel@bursor.com
                                                       aleslie@bursor.com

                                               *Counsel for Plaintiffs*